LAKEWOOD ENGINEERING CO. v. NEW YORK CENT. R. CO.

(Circuit Court of Appeals, Sixth Circuit. February 5, 1919.)

No. 3201.

1. CARRIERS ⬤╍189—RATES—RIGHT OF SHIPPER.

A shipper of goods has the right to refrain from assembling its ultimate product, or to disassemble the same, for shipment in any way that will make the shipment take a lower traffic rate than if the articles were in final form.

2. CARRIERS ⬤╍189—RATES—"PORTABLE RAILWAY TRACK SET UP IN SECTIONS."

Though a manufacturer of portable railway track did not attach to the rails the plates and bolts, although the sections consisted of two steel rails and steel cross-ties, which were riveted together, *held*, that the article was a "portable railway track set up in sections," within the tariff providing for that class of articles, and shipper was not entitled to commodity tariff on iron and steel rails and cross-ties.

3. CARRIERS ⬤╍192—RATES—CONTRACT.

Though shipper billed and carrier transported its articles under a particular tariff for a considerable time, notwithstanding articles fell within another duly published tariff, *held*, that the rule that practical construction of the contract of both parties will govern does not apply, so as to defeat the carrier's action for the difference between the rate charged and that which should have been exacted; parties having no power to vary a published tariff, even by express contract.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action by the New York Central Railroad Company against the Lakewood Engineering Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

The plaintiff in error contracted with the French government to manufacture and sell a quantity of portable railway track, and, in executing the contract, had occasion to ship large quantities of this material over the road of the defendant in error, to New York, for export. The track was manufactured and shipped in sections. Each section, in order to satisfy the contract, would consist of two steel rails in parallel position, steel cross-ties riveted at each end thereof to the rails and fish plates, with the necessary bolts for attaching the ends of the rails to the ends of those of the adjacent section. There was in force a classification which, among an infinite variety of items, contained the following: "Tracks, portable railway, set up in sections (carload minimum weight 36,000 pounds); less than carloads, third class; carloads, fifth class." The classification also contained this rule: "When articles which are not specifically provided for * * * are offered for transportation, agents may bill same at the ratings provided for analogous articles, notation to that effect to be made on waybills; and will at once report the facts to their general freight department, in order that specific classification may be provided for." There was also an express provision that "articles not enumerated will be classed with analogous articles." A tariff duly published provided a rate of 22.4 cents per 100 pounds for articles belonging to the fifth class. There was also in force a commodity tariff which contained the following item: "New iron and steel rails and iron and steel railroad cross-ties, for export only, in carloads; minimum weight 20 tons of 2,240 pounds." The rate fixed for this commodity was 10 cents per 100 pounds.

In the belief that it would gain certain rightful advantages thereby, the shipper did not completely assemble its sections in the manner above de-

scribed. It did not attach to the rails the plates and bolts, but shipped these separately and paid the freight thereon under another special commodity tariff, which all parties agree was applicable to the plates and bolts thus moving by themselves. The remainder of the product, as above described and in sections of varying length, was thereafter continuously shipped in this imperfectly completed form. The first shipments were inspected by the representative of the railroad designated therefor, and were by him pronounced to be the article named in the commodity tariff, and to be entitled to shipment at the 10 cent rate. About 100 cars were billed and shipped accordingly, and the shipper. paid to the railroad the freight thereon. The subject-matter then coming to the attention of another inspector, he thought the product in question ought to be shipped as fifth class and at the higher rate. The question was referred to a sort of appellate inspection board provided for that purpose by the associated railroads, and this board affirmed the opinion of the second inspector. Thereafter the shipper continued to bill its shipments as under the commodity tariff and to pay the freight therefor; the railroad changed the billing so as to show a shipment under the classification, accepted the payments made as being payments on account and rendered bills for the difference. This course of business continued for some time, but eventually the railroad refused to accept any further shipments without payment in full at the higher rate, and brought this suit for the balances which had accumulated after it had begun to insist that the higher rate was the lawful one.

The case came on for trial before a jury. During the progress of the trial, the District Judge reached the conclusion that, as matter of law, the railroad was entitled to recover, and directed a verdict accordingly. The shipper brings this writ of error.

Mark A. Copeland, of Cleveland, Ohio, for plaintiff in error.
S. H. West, of Cleveland, Ohio, for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] Without doubt, the shipper had the full right to refrain from assembling its ultimate product or to disassemble the same for shipment in any way which would make the shipment take a lower tariff rate than if the article were in final form. In re Suspension of Western Classification No. 51, I. C. C. No. 9, 25 I. C. C. 444, 487. If, therefore, within the true meaning of these two tariffs considered together, the defendant's product, in the form in which it was shipped, was rightly billed under the commodity tariff, the shipper has paid in full all lawful charges and there could be no recovery.

We assume, for the purposes of this opinion, and without undertaking to decide whether the assumption should in some cases be limited or qualified, that if there were ambiguity as to the two tariffs, or if there were material uncertainty as to the proper trade definition of an article shipped, there would be an issue of fact, and the action of the court below would have been erroneous.

[2] We see no room to doubt that the article shipped was "portable railway track, set up in sections." This phrase must be defined with reference to the situation in which and the purpose for which it is employed. It is familiar experience that the same words, found in different surroundings, do not necessarily have the same meaning. The only claim that this article does not respond to this definition is

based upon the fact that to furnish it would not be, or might not be, full compliance with the contract of purchase and sale which used the same definition. If a contract of sale were involved, the question would need attention; but we are not concerned with what the phrase would mean in another situation. We are only concerned with what it does mean in this railroad tariff. While the plates and bolts may be an essential part of a "ready to sell" section of a portable track, they are plainly but a mere incident or appurtenance to the substantial thing itself. For purposes of definition and classification, a steam engine does not cease to be such because the governor is omitted, nor would shoes be anything but shoes, if shipped without buttons or laces. These sections might have been provided with the bolts and plates, but one tie might have been left off, whereby the sections would not have been satisfactory for contract delivery until the missing tie had been supplied, but we think they would still be "sections of portable railway track"; and the same thought covers the deficiency which here existed.

Indeed, the shipper's contention is based, not so much on denying that this article was rightly denominated "portable railway track set up in sections," as upon the theory that it was also properly called "steel rails and ties," and hence that the shipper was entitled to the lower rate. In considering this contention, we must first observe that we are not called upon to make an absolute, but rather a distributive, definition. Neither the classification nor the commodity description can be fully apprehended without remembering that opposite it there stands another description, with which this is to be contrasted, and that the question is whether the article clearly belongs in either one of the two named classes. We must inquire, therefore, not whether these articles are, in any sense of the term, steel rails and ties, but whether they may be so considered in spite of the fact that they have an alternative and more accurate name.

It is first urged that the presence of the conjunctive "and" between "steel rails" and "steel ties," indicates that the two things were to be in association, that the phrase does not refer to rails or ties, and that, when rails and ties are permanently joined together, they constitute the precise and very thing referred to. We do not think so much force can be given to the choice of this single word. Sometimes the conjunctive is purposeful and effective to denote a particular meaning, but often the choice between disjunctive and conjunctive is casual and indifferently made. Even in the greatest strictness, the word "and" is not inappropriate to indicate that the specified rate is applied to ties and is applied to rails, in each case regardless of the presence or absence of the other. Marvel v. Merritt, 116 U. S. 11, 12, 6 Sup. Ct. 207, 29 L. Ed. 550.

It is next said that the shipper always has the choice whether to ship an article set up or knocked down, and that named articles do not necessarily lose their identity because they have been fastened together. This is true enough in many cases; the trouble here is that, by being fastened together to the extent and in the manner employed, they at once pass over into a more appropriate classification that is

waiting to receive them. These rails and ties ceased to be merely rails and ties; they were the raw materials which had been fabricated into something else.

[3] The third contention on the part of the shipper is the only one which, to our minds, is seriously forceful. It is that the railroad and the shipper were the two parties to this contract, and that both of them for a considerable period of time adopted and carried out a construction whereby this freight was to be treated under the commodity tariff. The familiar rule of practical construction by the parties is appealed to. If the matter were wholly one of private contract, it may be that this interpretation by the parties would sufficiently raise an issue of fact. We do not undertake to say; but there is more here than a merely private contract. A duly published tariff, in many respects, approximates a statute. Parties have no power to vary it by their express contract, much less merely by those implications arising from their conduct. Severe penalties are provided for its infraction or for any differential treatment of different shippers; and it cannot be permitted that the conduct of the railroad, by different agents at different times, should cause a tariff to mean one thing for one shipper and a different thing for another. We have no occasion to deny that there may be cases of ambiguity where a general or universal course of conduct may support one or the other construction; but in this case we think it the duty of the court to ascertain and declare the true respective meanings of these two tariffs as applied to the article here shipped, and we think the court below right in its disposition of the matter.

This conclusion makes it unnecessary to consider in detail the errors assigned as to admission or rejection of evidence; these all become merely incidental to the main question.

The judgment is affirmed.